IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In the Matter of an Application to Enforce an Administrative Subpoena of the<br><br>U.S. Commodity Futures Trading Commission,<br><br>        Applicant,<br><br>vs.<br><br>Monex Deposit Company, et al.,<br><br>        Respondents. | No. 14 C 6131<br><br>Magistrate Judge Schenkier |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on the United States Commodities Futures Trading Commission's ("CFTC") Application for an Order to Show Cause and Order Requiring Compliance with Administrative Subpoena against Respondent Monex Deposit Co. and affiliate companies Monex Credit Co. and Newport Service Corp. (collectively, "Monex"). The CFTC is a regulatory agency charged with authority under the Commodities Exchange Act, 7 U.S.C.A. §§ 1 *et seq.* (the "Act"), *as amended by* the Dodd Frank Wall Street Reform and Consumer Protection Act of 2010, Pub.L. No. 111–203, Title VII §§ 701–774, 124 Stat. 1376 (enacted July 21, 2010) ("Dodd-Frank"), to regulate "transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C.A. § 2(a)(1)(A). Monex is a California-based retail buyer and seller of precious metals.

On January 30, 2014, the CFTC commenced an investigation into Monex's "Atlas" precious metals investment program, seeking to determine whether Monex, through this program, is violating various provisions of the Act, including an exchange trading requirement,

an antifraud provision, registration requirements, and various record-keeping and reporting requirements (doc. # 19, CFTC Mem. at 5; doc. # 27, CFTC Reply at 1). In connection with that investigation, the CFTC issued a subpoena to Monex requiring the production of a variety of documents relating to the financed commodity transactions Monex offers to its customers (CFTC Mem. at 6-7). Chief among the items sought by the subpoena is a database containing various fields of information that would inform the CFTC as to how Monex generates and manages customer trading accounts, transaction statements, and internal reports (*Id.* at 7).[1] The subpoena also sought unredacted hard copies of certain documents, including customer account statements and financing statements (*Id.*).

In response to the subpoena, Monex produced more than 533,000 documents, including more than 400,000 monthly statements from some 46,000 customer accounts (doc. # 20, Monex Opp'n at 8). However, Monex redacted customer contact information from that hard copy production (*Id.*). In addition, Monex declined to produce the "electronic back-up data to certain documents," objecting that the information was irrelevant to the CFTC investigation and would invade customer privacy (*Id.*). This refusal led to the filing of the instant application, which sought full compliance with the subpoena (CFTC Mem. at 1).

Monex responded to the application by arguing that the CFTC lacks authority to obtain this information about the Atlas Program pursuant to Section 2(c)(2)(D)(ii)(III)(aa) of the Act—a

---

[1] These fields of information include, per customer: (1) the account number; (2) the customer's name; (3) the trade number; (4) the trade date; (5) the units of a commodity purchased; (6) the form of the commodity; (7) the type of trade; (8) the market value of the trading position; (9) the age of the trade; (10) the original cost per unit; (11) the customer's equity; (12) the transaction cost; and (13) the customer's cash balance (CFTC Mem. at 8). From this information, the CFTC seeks to determine, among other things: (a) how rapidly customers trade in and out of their positions; (b) how frequently customers offset their trading positions in less than 28 days; (c) how many Monex customers hold short position; (d) how many Monex customers hold concurrent long and short trading positions; (e) how frequently customers get margin calls; (f) how frequently customers fail to meet margin calls; and (g) how frequently are customers' trading positions being "force liquidated" (*Id.* at 8; CFTC Reply at 10).

provision that exempts from CFTC jurisdiction those retail commodity transactions that "result[ ] in actual delivery within 28 days" (Monex Opp'n at 1). Monex contends that under the Atlas program, it always provides for "actual delivery within 28 days after payment by transfer of title to the customer" (*Id.* at 5). Further, Monex argues that the CFTC lacks any other jurisdictional basis upon which to regulate its activities, including, most specifically, Section 6(c)(1) of the Act, *as amended*, 7 U.S.C. § 9(1), which is the statutory provision regulating deceptive conduct in connection with a contract of sale of a commodity in interstate commerce (*Id.* at 3).[2]

In reply, the CFTC contends that the issue of "actual delivery" of the metals is a "factual inquiry turning on the possession of and control over the metals" (CFTC Reply at 1). Monex's transactions, the CFTC maintains, are arguably covered by Section 2(c)(2)(D), as it is far from clear that Monex customers have "actual" possession or control over the metals. According to the CFTC, Monex customers may have only constructive possession of their metals, which is insufficient to satisfy the exemption set forth in Section 2 (*Id.* at 4). The CFTC also asserts that Section 6(c)(1) provides it with an independent basis to pursue this investigation into Monex's Atlas program (*Id.* at 13).

Monex filed a surreply in which it fought back against the CFTC's constructive possession argument, contending that "CFTC concedes by silence that there is no *factual* indication that Monex has ever failed to actually deliver even one ounce of customer metals to depositories" (doc. # 28, Monex Surreply at 1 (emphasis in original)). Accordingly, Monex

---

[2]Section 6(c)(1) provides (emphasis added) :

It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, *or a contract of sale of any commodity in interstate commerce*, or for future delivery on or subject to the rules of any registered entity, *any manipulative or deceptive device or contrivance*, in contravention of such rules and regulations as the Commission shall promulgate. . . .

3

argues that this case involves a purely legal question regarding actual delivery that should be resolved in its favor pursuant to the Seventh Circuit's decision in *EEOC v. Sidley Austin Brown & Wood*, 315 F.3d 696 (7th Cir. 2002) (*Id.*).

We have considered the parties' lengthy submissions, as well as the discussion during oral argument held on November 17, 2014. From the parties' briefs, we note that Monex attempts to distill into a single legal issue its objection to CFTC's subpoena, as follows: that "CFTC lacks any jurisdiction to seek customer contact information and a digital database showing customer trading performance for Monex's thousands of individual customers" (Monex Opp'n at 1). However, the Court finds it useful to consider embedded within that articulation of Monex's position three separate arguments: (1) that the CFTC lacks jurisdiction over Monex's financed retail commodity transactions pursuant to Section 2(c)(2)(D) of the Act because Monex always provides for "actual delivery" within 28 days and thus the transactions are not futures contracts subject to CFTC oversight; (2) that, at a minimum, the question of CFTC jurisdiction is sufficiently doubtful such that the CFTC should be limited at this time to obtaining information relevant to whether it has jurisdiction, and thus the CFTC's application is overly broad because it seeks information that has nothing to do with that question; and (3) that Section 6 does not create an independent basis for the CFTC to investigate Monex over precious metals transactions that are otherwise exempted by Section 2.

## I.

At the outset, we note that during oral argument the CFTC narrowed the scope of the dispute by stating—at least for now—that it would not seek disclosure of the customer contact information (11/17/14 Tr. at 60-61). As a result, we deem the part of the CFTC application seeking that information to be withdrawn without prejudice.

4

## II.

We next address the question of whether the CFTC may investigate Monex's precious metals sales pursuant to Section 2 of the Act. In so doing, we start with the proposition that an agency's investigative authority is broad. In *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950), the Supreme Court recognized that, much like a grand jury, a regulatory agency is empowered to investigate conduct "merely on suspicion that the law is being violated, or even just because it wants assurances that it is not." For this reason, an administrative agency is not like a judicial court, which "is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation." *Id.* at 643. Rather, an administrative agency has a "power of inquisition," which is not derived from the judicial function. *Id.* Accordingly, a regulatory agency such as the CFTC may commence an investigation to decide whether it even has authority over a party, provided the party's conduct even "superficially" appears to bring it within the reach of the agency. *Commodity Trend Serv., Inc. v. CFTC*, 233 F.3d 981, 986 (7th Cir. 2000).

Flowing from the broad investigative authority given to administrative agencies is the principal that challenges to an agency's authority to investigate—which we will refer to as "coverage" challenges—may only be raised as a defense to a subpoena enforcement proceeding under "very limited and exceptional circumstances." *FTC v. Feldman*, 532 F.2d 1092, 1095-96 (7th Cir. 1976); *see also United States v. Construction Prods. Research, Inc.*, 73 F.3d 464, 470 (2d Cir. 1996). This "exceptional circumstances" limitation tracks the general rule that "[a] court exercises only limited review of an agency's actions in a subpoena enforcement proceeding and does not normally consider the merits of a party's claim that it has not violated a statute administered by the agency." *Commodity Trend*, 233 F.3d at 986. An example of a permissible

5

challenge to coverage at the investigatory stage is when the subpoena is "plainly incompetent or irrelevant to any lawful purpose of the [agency] in the discharge of [its] duties." *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943); *see also Commodity Trend*, 233 F.3d at 986 (finding that an agency may not engage in "impermissible overreaching"). Of course, we might add that a party is free to fully challenge the coverage issue in the event the administrative agency decides to bring an enforcement action upon completion of its investigation.

In *EEOC v. Sidley Austin Brown & Wood*, 315 F.3d 696 (7th Cir. 2002), the Seventh Circuit addressed this body of law. There, the EEOC commenced an investigation into whether the Sidley law firm's demotion of 32 equity partners might have violated the Age Discrimination in Employment Act ("ADEA"). As part of its investigation, the EEOC served a subpoena on the firm seeking information probative of both whether the partners were "employees" and thus covered by the ADEA, and whether the law firm's actions may have constituted age discrimination. The law firm provided most but not all of the information pertaining to "coverage" (that is, whether the partners were in fact "employees" of the firm) but objected to producing information pertinent to whether discrimination may have occurred. *Id.* at 698. The law firm argued that it had given the EEOC enough information to show that demoted firm members were "real" partners and not employees, and that the law firm's actions thus were not subject to oversight by the EEOC—a regulatory agency whose authority extends only to investigating whether there has been unlawful discrimination against "employees," and not to claims of discrimination against "employers" such as law firm partners. The law firm refused to comply fully with the subpoena, arguing that the question of whether the demoted partners fell within the protection of the ADEA was a "jurisdictional" one that, if answered in the law firm's

6

favor based on information already divulged, required that the EEOC halt its investigation. *Id.* at 699.

The Seventh Circuit dismissed the law firm's jurisdictional argument, stating that "Sidley can obtain no mileage by characterizing the coverage issue as 'jurisdictional.' It is the law that the EEOC cannot protect employers; and, it is also the law that like any agency with subpoena powers, the EEOC is entitled to obtain the facts necessary to determine whether it can proceed to the enforcement stage." *Sidley*, 315 F.3d at 699. The only exception is if the subpoena seeks information that "is not even arguably relevant, because it is evident at the outset that whether the agency has any business conducting the investigation depends on a pure issue of statutory interpretation" that the court can resolve right away. *Id.* at 700. In such a case, the subpoena may be challenged as "unreasonable" because it ranges "far beyond the boundaries of . . . statutory authority." *Id.*

As an example of such a case, the Seventh Circuit cited to *Reich v. Great Lakes Indian Fish & Wildlife Comm'n*, 4 F.3d 490 (7th Cir. 1993). In that case, the Secretary of Labor sought, pursuant to the Fair Labor Standards Act of 1938, to enforce a subpoena seeking access to the respondent's records on wages, hours, and other terms. *Id.* at 491; *see also Martin v. Great Lakes Indian Fish and Wildlife Comm'n*, No 92-C-409-C, 1992 WL 300841, at *1 (W.D. Wisc., Oct. 7, 1992). The respondent, a consortium comprised of numerous Native American tribes, objected on the basis that it was exempt from the operative statute. The district court, and the appellate court on review, concluded that the question of statutory coverage was ripe for judicial review because coverage could be conclusively determined from a purely legal standpoint based upon information that was separate and distinct from anything the subpoena would have produced. *Martin*, 1992 WL 300841 at *6; *Reich*, 4 F.3d at 491-92.

In *Sidley*, the Seventh Circuit explained that the EEOC subpoena to the law firm did not present a situation akin to *Great Lakes*, where the subpoena was deemed unreasonable because it pertained to an investigation clearly outside of the regulatory agency's statutory authority. 315 F.3d at 701. Nonetheless, the appeals court concluded that the EEOC had not yet "earned the right" to require compliance with the portion of the subpoena seeking information bearing on whether there was conduct that might constitute age discrimination. *Id.* at 707. The appeals court found that although the EEOC was entitled to full compliance of the subpoena with regard to information it sought pertaining to coverage, it was not yet entitled to documents relating to discrimination because neither party had "proposed a standard or criterion to guide the determination" of "*why* some or all members of partnerships should for purposes of the federal antidiscrimination laws be deemed employers and so placed outside the protection of these laws." *Id.* at 707, 701 (emphasis in original). That question, the appeals court explained, might have been avoidable had the ADEA contained a provision expressly exempting discrimination against "partners" from the scope of the law. *Id.* at 701-02. But, since it did not, many questions remained unanswered pertaining to whether partners were "employers" under state law; whether they were "employers" within the meaning of federal anti-discrimination statutes such as ADEA and Title VII; and whether state law classifications were relevant to this inquiry. *Id.* at 702. This problem of line-drawing and labeling, coupled with the fundamental failure of the parties to inform the court of the purpose behind excluding employees from federal anti-discrimination laws, meant that the standard by which to judge the coverage issue remained "murky." *Id.* at 707. The appeals court's path through this murkiness was to bifurcate the remaining production: the court limited compliance, at least at first, to the question of coverage, leaving for later the issue of the EEOC's request for information concerning possible discrimination. *Id.*

Each party in this case seeks to use *Sidley* to its advantage. The CFTC invokes the language in *Sidley* that draws upon cases supporting the view that a regulatory agency's right to issue investigatory subpoenas should be free from coverage challenges prior to an actual enforcement proceeding. For its part, Monex seizes upon the *Sidley* court's limited enforcement of the EEOC subpoena to support its claim that the CFTC's subpoena should be narrowed in scope to just the issue of whether the CFTC has what Monex persistently and incorrectly calls "jurisdiction," while reserving for later, if at all, any inquiry into whether there is evidence of fraud or other statutory violations.[3]

We view *Sidley's* analysis and holding as much more nuanced than either party suggests. *Sidley* serves as a reminder that these highly factual, statutorily-based investigatory subpoena cases exist along a continuum. At one end of the continuum are cases such as *Great Lakes*, where it was evident that the regulatory agency's authority was so far wide of the mark that the subpoena could be found "unreasonable" on that basis alone. At the other end of the continuum are those cases in which the investigatory agency clearly acted within its authority, and thus there was no doubt that the subpoena fell well within the boundaries of statutory authority. While the specific facts in *Sidley* nudged its outcome closer towards the *Great Lakes* end of the "investigatory subpoena spectrum," we remain mindful that *Sidley* also supports the time-honored principal that subpoena respondents should not be able to routinely litigate coverage issues at the investigatory phase. We decline any invitation to find that *Sidley's* holding constitutes an open invitation for investigatory subpoena recipients to come to the courthouse

---

[3]Monex's frequent objections to CFTC's subpoena as outside of the agency's "jurisdiction" is surprising given that the *Sidley* court expressly found as "irrelevant" the law firm's attempt to characterize "coverage" issues as "jurisdictional" in an effort to side-step the subpoena. 315 F.3d at 701. That said, Monex's mislabeling of the issue as jurisdictional is of no consequence, as we still must address whether, under *Sidley*, the CFTC investigation at this time should be limited to whether the Atlas program falls under the Section 2 exemption for transactions where "actual delivery" occurs within 28 days, and, if so, whether the information sought by the subpoena bears on that question.

9

door seeking to dictate the terms of an agency's investigation. In plainest terms, *Sidley* does not alter the balance that already has been established by long-standing Supreme Court jurisprudence with respect to investigatory subpoenas.

### III.

With these principles in mind, we turn to the CFTC subpoena at issue here and compare it to the situation presented in *Sidley*. A side-by-side analysis of the two cases leads us to conclude that a "bifurcated" approach to the CFTC's subpoena is both unnecessary and unwarranted. We arrive at this conclusion based on our findings of clear statutory purpose and an absence of "murkiness" regarding the standards used in determining "actual delivery."

In *Sidley*, neither party was able to explain to the appeals court's satisfaction the underlying purpose for federal antidiscrimination statutes placing employers outside of their protection—an explanation that could inform the court's consideration of whether the Sidley partners at issue should be considered "employers" or "employees" under the ADEA. *Id*. at 701-02. In other words, it was far from clear to the court whether the terminated partners even qualified for protection under the ADEA. In the absence of having "proposed a standard or criterion to guide the determination" of whether to include or exclude partnerships from antidiscrimination statutes, the court concluded that the EEOC had not "earned the right" to force the law firm to produce "the voluminous and sensitive documentation" probative of whether the 32 demoted lawyers were demoted on account of their age. *Id*. at 707. *Sidley* tells us that an agency seeking to move forward with an investigative subpoena needs to assure the court that there is cause to believe that the underlying statute is being applied on behalf of persons falling within the statute's scope. The failure to do so may warrant an order of bifurcation so as to

10

provide a better showing of coverage before full compliance with the subpoena seeking merits information will be commanded.

Here, we are not similarly adrift as to statutory purpose. The CFTC is vested with authority under the Act to regulate "transactions involving . . . contracts of sale of a commodity for future delivery" on behalf of the retail public. 7 U.S.C.A. § 2(a)(1)(A). As succinctly noted by the Eleventh Circuit in *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1329 (11th Cir. 2002), "the [Act] is a remedial statute that serves the crucial purpose of protecting the innocent investor here—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." It is clear to this Court that the approximately 46,000 persons who have invested in Monex's Atlas program, and perhaps future investors too, are the intended beneficiaries of the operative statute (the Act). Thus, unlike the case in *Sidley*, we have no lack of understanding concerning the purpose of the operative statute or whether a group of persons intended to be protected by the statute is the subject of the investigation. In this case, the Court has been given no reason to question whether Monex's Atlas customers are the kinds of investors who fall within the scope of the Act, and that is one reason we find *Sidley* inapposite.

In addition, this is not a case where there are no standards by which to determine the meaning of "actual delivery," which is an inquiry central to whether transactions under the Atlas program qualify for the Section 2(c)(2)(D)(ii)(III)(aa) exemption. We recognize that this term is not defined in the Act. But we do not find this lack of definition sufficient to align this case with *Sidley* because "actual delivery" can be given a plain and ordinary definition. We strive to do so "because we assume that Congress uses words in a statute as they are commonly understood." *CFTC v. Hunter Wise*, 749 F.3d 967, 976 (11th Cir. 2014) (citations omitted); *see also Marx v. Gen. Revenue Corp.*, —— U.S. ——, 133 S. Ct. 1166, 1172 (2013) (finding, in statutory

interpretation, that courts "assum[e] that the ordinary meaning of [statutory] language accurately expresses the legislative purpose") (internal quotations and citations omitted); *Nutrilab, Inc. v. Schweiker*, 713 F.2d 335, 337 (7th Cir. 1983) (finding that "[i]n the absence of clearcut Congressional guidance, it is best to rely on statutory language and common sense"). There are numerous sources from which the meaning of actual delivery can be drawn and its existence can be assessed. In *Hunter Wise*, a case that similarly involved the question of whether a buyer and seller of precious metals provided "actual delivery" to its customers within the context of Section 2 of the Act, the Eleventh Circuit focused on a definition of "actual delivery" drawn from Black's Law Dictionary, noting:

> Because the Act does not define the term "actual delivery," 7 U.S.C. § 1a, we again refer to the ordinary meaning of the term to interpret the statute. *Polycarpe*, 616 F.3d at 1223. "Delivery" is "[t]he formal act of transferring something"; it denotes a transfer of possession and control. *Black's Law Dictionary* 494 (9th ed. 2009). "Actual delivery" denotes "[t]he act of giving real and immediate possession to the buyer or the buyer's agent." *Id.* "Actual" is that which "exist[s] in fact" and is "real," rather than constructive. *Id.* at 40.

749 F.3d at 978-79.

The Eleventh Circuit also noted an additional source of information, the CFTC's own 2013 Interpretive Letter. *See* Retail Commodity Transactions Under Commodity Exchange Act, 78 Fed. Reg. 52426-01, 2013 WL 4478571 (Aug. 23, 2013). The Interpretive Letter notes that determining whether actual delivery has occurred "requires consideration of evidence regarding delivery beyond the four corners of contract documents." *Id.* at 52427. The CFTC stated that it would thus "employ a functional approach and examine how the agreement, contract, or transaction is marketed, managed, and performed, instead of relying solely on language used by the parties in the agreement, contract, or transaction." *Id.* The CFTC explained that it adopted that approach because it "best accomplishes Congress's intent" when enacting Dodd-Frank and "gives full meaning" to the statutory term "actual delivery." *Id.* at 52428.

12

The Interpretive Letter provides examples of when "actual delivery" would or would not occur. Two scenarios in which actual delivery would exist is where the seller physically delivers the entire quantity of the commodity to the buyer or to an independent depository, and title has transferred to the buyer. *Id.* at 52428. The Interpretive Letter further states that "[t]he Commission may also determine that actual delivery has occurred in circumstances beyond those described in the first two examples if it can readily determine within a reasonable period of time that the purported delivery is not simply a sham and that actual delivery has occurred within 28 days within the meaning of new CEA section 2(c)(2)(D)(ii)(III)(aa)." *Id.*

The existence of these standards gives meaning to the term "actual delivery" and satisfies us that we are not faced with the basis or need for bifurcation such as existed in *Sidley*. Furthermore, for purposes of today's determination (which is simply to determine whether the CFTC is entitled to the full effect of its subpoena, subject to the modifications stated herein), the CFTC has provided this Court with sufficient evidence regarding the question of possession and control over the consumers' precious metals under the Atlas program to make the case that delivery of the metals is only "constructive" and not "actual." More is not required at this juncture.

Monex argues that the CFTC has changed its tune and departed from positions it took back in the 1980s and 1990s when it found that Atlas transactions were not "futures." We agree with the CFTC that it is not bound by positions it took years ago. The Act has been amended numerous times over the years to respond to changing market circumstances, most significantly by the Dodd-Frank Act of 2010.[4] Indeed, the Interpretive Letter setting forth the CFTC's

---

[4]The Act, created in 1936, was overhauled in 1974 "'in order to institute a more comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex.'" *Geldermann, Inc. v. CFTC*, 836 F.2d 310, 312 (7th Cir. 1987) (quoting *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 3250, 92 L.Ed.2d 675 (1986)) (quoting H.R.Rep. No. 93–975, 93rd Cong., 2d Sess. at 1 (1974)). The CFTC itself

13

approach to "actual delivery" reflects its interpretation of Dodd-Frank and was reached after receiving a broad range of public comment—including from Monex itself. And, according to the Interpretive Letter, none of the comments "criticized, expressed disagreement with, or questioned the underlying foundation for the Commission's approach in determining whether 'actual delivery' has occurred, as set forth in the Interpretation." 78 Fed. Reg. 52426, 52427.

At any rate, "[a]n agency changing course 'need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better.'" *Investment Co. Institute v. CFTC*, 720 F.3d 370, 372 (C.A.D.C. 2013) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)) (emphasis in original). The CFTC has presented us with sufficient evidence suggesting the possibility that actual delivery did not take place such that Monex's Atlas transactions do not fall within the exception to Section 2. Of course, that does not mean that the CFTC ultimately will conclude that there has not been actual delivery, or that the CFTC will conclude there was any fraud or other violations and thus decide to bring a resultant enforcement action. It only means that the CFTC has provided sufficient evidence to this Court to move forward with its subpoena.

## IV.

The foregoing analysis explains why this Court concludes that the phased approach employed in *Sidley* is inapplicable here. But we also offer two additional points that distinguish this case from the circumstances presented by *Sidley*.

---

was a product of the 1974 overhaul and was given "sweeping authority to adopt any rules that in its judgment are necessary to effectuate the purposes of the Act." *Id.*; Commodity Futures Trading Commission Act of 1974, Pub.L. No. 93-463, 88 Stat. 1389 (1974). Other expansions to CFTC's oversight have occurred; most recently the 2010 Dodd-Frank Act, which gave CFTC authority over "retail commodity transactions." 7 U.S.C. § 2(c)(2)(D).

14

*First*, the EEOC subpoena at issue in *Sidley* sought information that the appeals court found could be neatly separated between the issues of "coverage" (that is, whether the partners were "employees") and "discrimination." The CFTC says that this case is different because the information it seeks from the Monex database would, in its judgment, provide evidence relevant both to whether there was "actual delivery" and whether there was any fraudulent conduct. Monex disagrees, and claims that the information that the CFTC seeks would shed no light on the question of actual delivery and only reflects an effort to hunt for fraud that Monex says does not exist and is not within the mission of the CFTC to investigate.

After considering the parties' arguments on this question, we are not persuaded that the information sought by the CFTC is wholly unrelated to the question of actual delivery. The CFTC has explained various theories as to how the information it seeks might help show whether there was (or was not) actual delivery. In particular, we note that the database the CFTC seeks includes information that would allow the CFTC to assess how the agreements are "marketed, managed, and performed," which are considerations set forth in the Interpretive Letter for determining the question of actual delivery. Monex has offered its criticisms of those theories, which Monex is surely entitled to do. But we do not find those criticisms to be sufficient to limit the scope of the subpoena.

*Second*, in *Sidley*, the law firm sought to bar production of voluminous and sensitive information pertaining to whether the 32 demoted partners were demoted on account of their age. The information falling with the "discrimination" portion of the subpoena was separate and distinct from the "coverage" aspect of the subpoena, which focused on issues like profit sharing. *Id.* at 707. The *Sidley* court noted the increased burden associated with full compliance with the subpoena, and it was not willing to force this burden upon the law firm in the wake of the

15

EEOC's failure to better explain why the demoted partners should even be entitled to protection under federal anti-discrimination laws.[5] Here, by contrast, Monex does not argue that full compliance with the subpoena would be a great burden; in fact, Monex has offered suggestions as to how it could manage the flow of all the information, including paying for an expert to essentially look over the CFTC's shoulder during its review to ensure that the CFTC averts its eyes to avoid assessing whether the information does or does not suggest the existence of fraud (11/17/14 Tr. at 57-58). All of this makes clear that Monex is quite able to give the CFTC the full complement of information it seeks in its database without taking on any undue burden. Monex's true objection is not that it would be burdensome to produce the database; rather, its objection is to having the CFTC look at the information for evidence of fraud. This is not a "burden" that we recognize, or one that is a basis to limit the investigation of a regulatory agency whose mission is to root out the existence of fraud if it has occurred.

## CONCLUSION

For the foregoing reasons, we reject Monex's attempt to raise the issue of coverage at the investigatory phase of these proceedings as a defense to full compliance with the CFTC's subpoena. *See U.S. Commodity Futures Trading Comm'n v. Worth Bullion Group, Inc.*, No. 12 C 2431, 2012 WL 4097725, at *3 (N.D. Ill., Sept. 17, 2012) (granting the CFTC's application for enforcement of administrative subpoenas in factually similar case). We therefore grant the CFTC's application (doc. # 2). Monex shall produce the database requested in the subpoena. The production shall be made by January 16, 2015. Because the CFTC withdraws, at least for now, its request for the customer contact information that has been redacted from the customer

---

[5] One possible reason for excluding them, as articulated by the appeals court, is that partnership laws provide effective remedies against oppression, and because partnerships would be poisoned if partners could sue each other for discrimination. *Id.* at 702. On the other hand, allowing partners to sue each other under anti-discrimination statutes would encourage consistency and unfettered access to statutorily-created remedial mechanisms. *Id.*

accounts, we need not address the issue of compliance with this portion of the subpoena. And, because we hold that the Section 2 exemption does not prohibit the CFTC from seeking the information at issue, we need not consider the matter of whether the CFTC independently has authority to investigate Monex under Section 6 of the Act.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: December 17, 2014